# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

CATALIN G. PAVEL,

    Plaintiff,

v.

ADAMS COUNTY SHERIFF'S OFFICE; SHERIFF DOUGLAS N. DARR, in his official capacity; and UNDERSHERIFF ROGER ENGELSMAN, in his official capacity,

    Defendants.

___

## COMPLAINT
___

Plaintiff, Catalin G. Pavel, by and through his counsel, BEEM & ISLEY, P.C., respectfully submits this Complaint against the Defendants, Adams County Sheriff's Office, Sheriff Douglas N. Darr, and Undersheriff Roger Engelsman, and alleges and avers as follows:

### JURISDICTION AND VENUE

1.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, §1981a, and §1988. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

2.    Venue is proper in the United States District Court in Colorado pursuant to 28 U.S.C. § 1391(b) because the Defendants are residents of Colorado and the events and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3. Plaintiff, Catalin G. Pavel, is and was at all times relevant to this Complaint a citizen of the State of Colorado, residing in Brighton, Colorado. Plaintiff is a male immigrant from Romania who was previously employed by the Adams County Sheriff's Office as a Deputy Sheriff.

4. Defendant, Adams County Sheriff's Office ("Sheriff's Office"), is a county office created by the Colorado Constitution, *see* Colo. Const. Art. XIV, §8, with its principal office located at 332 North 19th Avenue, Brighton, Colorado 80601.

5. Defendant, Sheriff Douglas N. Darr ("Sheriff Darr"), is and was at all times relevant the individual elected to the county office of the Sheriff of Adams County, a resident of the State of Colorado, and an agent for the Sheriff's Office.

6. Defendant, Undersheriff Roger Engelsman ("Undersheriff Engelsman"), is and was at all times relevant the individual appointed by Sheriff Darr to the county office of the Undersheriff, a resident of the State of Colorado, and an agent for the Sheriff's Office.

## GENERAL FACTUAL ALLEGATIONS

7. Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 6 of this Complaint.

8. The claims and allegations set forth herein all arise out of a series of hostile, discriminatory, adverse, and retaliatory treatment against Plaintiff in connection with his employment as an Adams County Deputy Sheriff.

9. Plaintiff was born in Romania in 1975, while it was still part of the Soviet/communist block of East European nations. He immigrated to the United States in

February 1996 and became a U.S. citizen in 2002. Plaintiff earned a Bachelor of Science ("B.S.") degree in applied psychology with emphasis in criminal psychology from Regis University in 2006, and he earned a Master's degree in Organizational Leadership, specializing in Strategic Management, from Colorado State University in 2011. Plaintiff speaks three languages fluently: Romanian, English, and Spanish. Plaintiff speaks English beautifully with a foreign accent.

10. The Sheriff's Office hired Plaintiff in December 2002 as a civilian Community Service Officer. In December 2003, Plaintiff became a Deputy Sheriff—first assigned to the jail division and then the patrol division as of April 2005. Plaintiff eventually became a Senior Deputy Sheriff—a position he maintained until his termination. Plaintiff early and often expressly stated that one of his career goals was to become a detective for the Sheriff's Office.

*Facts Relating to Plaintiff's First Charge of Discrimination*

11. During the course of his employment with the Sheriff's Office, certain co-workers and fellow law enforcement officers of Plaintiff addressed and referred to him as "communist," "eastern block," or worse, "eastern block fucker," in reference to his foreign accent and Romanian birthplace (an Eastern European nation formerly associated with communist Soviet Union). Even Captain T. J. Coates, a higher ranking and supervisory officer, used the terms "eastern block" and "eastern block fucker" to address or refer to Plaintiff. This conduct continued at least through December 2011.

12. At first, the name-calling and disparaging references seemed harmless; but over time, the tone and context became more negative, aggressive, and hostile.

3

13. In late 2008, Plaintiff applied for a position as Crime Lab Detective—a position for which he met both minimum and preferred qualifications as a result of his experience, testing, and education. In approximately March 2009, Plaintiff went through the published procedures to test and qualify for the position. Out of all candidates for the position, Plaintiff ranked number 1 following the testing process and background checks. At the end of the process, Plaintiff was required to go through an additional unannounced interview with the Captain of the Detective Division, Captain Fred Stoll. Following this extra, previously unannounced interview, Plaintiff's ranking was lowered to number 2; and the detective position was given to another officer, Mark Bailey.

14. Later, in approximately September 2011, Plaintiff learned from another Sheriff's Office deputy with direct knowledge that Officer Bailey not only ranked lower than Plaintiff on his test scores, but also had less patrol experience than Plaintiff, had no Bachelor's degree, did not speak Spanish (a useful second language to possess as a detective in Adams County, Colorado), and had a worse on-the-job driving record than Plaintiff (an important consideration when issuing a take-home vehicle to a detective). Officer Bailey was not born in a foreign country.

15. Nevertheless, Plaintiff was on a new eligibility list to fill four (4) vacancies in the Detective Division. Plaintiff was fourth on a list of five eligible candidates—ranked in order of eligibility. The list was scheduled to expire on December 2, 2011. On November 29, 2011, the Sheriff's Office made an internal announcement for a new testing process for the detective positions. On November 30, 2011, Plaintiff contacted Captain Michael McIntosh,

4

Administrative Captain, concerning his interest in being considered for the available detective positions as Plaintiff was still on the active eligibility list.

16.     Despite the four vacancies, Captain McIntosh informed Plaintiff that only the first three on the list were being transferred to the Detective Division, that Plaintiff would not be considered, and that he must go through the transfer process again.  Captain McIntosh gave no explanation for the decision.  Even assuming there was an issue or problem with the fast-approaching expiration deadline, alternative solutions existed under the Sheriff's Office policy, including extending the timeframe for the eligibility list, or promoting Plaintiff on paper with actual transfer to occur at a later more suitable time.

17.     Plaintiff later learned that the officer below him on the list (ranked number 5) was promoted to criminal lab detective.

18.     None of the four officers transferred from the list to detective positions were born in foreign countries.

19.     Also in 2011, Plaintiff was nominated to receive a Life Saving Medal as a result of Plaintiff's live-saving CPR performed on an elderly man during an emergency medical call in 2010.  The man expressed his extreme gratitude to Plaintiff and the Sheriff's Office by sending thank-you notes.  When Plaintiff learned of the nomination, he contacted two of his superiors, including Captain McIntosh, on or about April 15, 2011, to inquire about the award so that Plaintiff could invite the man whose life he saved to the award ceremony.  Captain McIntosh responded to Plaintiff's inquiry about two weeks later on April 29, 2011, informing him that it was too late for him to receive a medal but that he could get one in 2012.  Plaintiff learned later,

though, that medals are not awarded retroactively.  Additionally, other nominated officers have received the medal for much lesser actions.

20. In September 2011, Plaintiff arrested a man with a trapped squirrel who admitted that he was in the process of taking the squirrel to a nearby waterway to drown it.  An independent witness also corroborated that the man was known for trapping and drowning squirrels.  Plaintiff made the arrest based on a charge of cruelty to animals, which is a class 6 felony.  Following the arrest, Plaintiff was forced to release the man.  Captain Coates took the position that Plaintiff lacked probable cause for the arrest, while Lieutenant Mitchell seemed less concerned about probable cause and more concerned about potential liability to the Sheriff's Office for any harm the man might have suffered in the jail.  In any event, situation was used as a basis to berate, belittle, and humiliate Plaintiff within the Sheriff's Office for making an arrest that he believed he was obligated to do as a Deputy Sheriff under Colorado law.

21. After responding to a call for service in October 2011 to cover for Lieutenant Mark Mitchell, Plaintiff pulled his handgun to protect himself, if necessary, from an unleashed growling pit bulldog that started to approach them.  At that moment in time, Plaintiff's handgun was the only effective weapon he had available.  Luckily, when Plaintiff pulled and pointed the gun, the dog retreated back to a yard across the street.  Following the incident, Lieutenant Mitchell admonished Plaintiff for pulling his handgun on the dog and reported the incident to Plaintiff's supervisor.  Not only did the Plaintiff not shoot or kill the dog, but others in the Sheriff's Office who had actually shot and killed potentially vicious dogs were not admonished for those incidents.  In fact, the policy of the Sheriff's Office allowed officers to kill vicious animals or animals that were severely wounded.

22. As a result of these incidents, which taken in combination with each other, including the increasingly inappropriate and hostile names used to address and refer to him, Plaintiff became concerned that he was being treated differently and detrimentally from others in the Sheriff's Office who were born in the United States and spoke without any sort of foreign-sounding accent. Accordingly, on or about December 5, 2011, Plaintiff submitted his first Charge of Discrimination (Charge No. 541-2012-00867) against the Sheriff's Office with the Equal Employment Opportunity Commission ("EEOC").

23. Plaintiff received notification from the EEOC of his right to sue for this charge on April 9, 2014.

### *Facts Relating to Plaintiff's Second Charge of Discrimination*

24. On January 4, 2012—just one month after Plaintiff filed his first Charge of Discrimination—the Sheriff's Office placed him on a Performance Improvement Plan ("PIP") for "noticeable decreases in an employee's performance." The specific issues for improvement identified in the PIP form were based directly on two of Plaintiff's examples of discriminatory treatment set forth in his first Charge of Discrimination that occurred three to four months earlier—(1) admonishing Plaintiff for pulling a handgun on a potentially vicious dog in October 2011, and (2) berating, belittling, and humiliating Plaintiff for arresting a man who had been trapping and drowning squirrels for cruelty to animals in September 2011.

25. At all times prior to being placed on PIP, Plaintiff earned above average performance evaluations. In fact, at the time of Plaintiff's most recent prior employment evaluation from February 13, 2011, Plaintiff met or exceeded expectations on all categories and earned an overall score of 3.8 out of a possible total of 5.

7

26. In placing Plaintiff on PIP, the Sheriff's Office also suspended him as a Field Training Officer, thereby depriving Plaintiff of the ability to earn extra income.

27. As a result of this action by the Sheriff's Office, Plaintiff submitted his second Charge of Discrimination (Charge No. 541-2012-01081) against the Sheriff's Office with the EEOC on or about January 17, 2012.

28. Plaintiff received notification from the EEOC of his right to sue for this second charge on April 9, 2014.

### *Facts Relating to Plaintiff's Third Charge of Discrimination*

29. Plaintiff completed the 90-day PIP procedure without any findings of significant performance deficiencies.

30. In approximately May or June 2012, the Sheriff's Office initiated a criminal investigation of Plaintiff arising out of a May 17, 2012 Driving-Under-the-Influence arrest made by Plaintiff. The investigation centered on whether Plaintiff truthfully reported waiting the required 20 minutes before administering a breath test for blood alcohol levels on the suspect.

31. On or about July 9, 2012, Plaintiff was then criminally charged with two counts of forgery and second degree official misconduct for allegedly falsifying arrest records. In connection with these charges, Plaintiff was detained and arrested by officers and agents of the Sheriff's Office, served with a felony summons that restricted Plaintiff's freedom of movement and required him to appear in court, and obtained fingerprints, DNA samples, and other uniquely personal identifying information for purposes of filing reports to the Colorado and Federal Bureaus of Investigation. The Sheriff's Office also placed Plaintiff on administrative leave. All of this caused Plaintiff to lose his ability to engage in permissible off-duty employment, such as

teaching college-level classes and other approved law enforcement related activities, which Plaintiff regularly did for extra income.

32.     The investigation and subsequent arrest were based on a video recording of the Plaintiff and the suspect at the Adams County substation that, according to the Sheriff's Office, showed that Plaintiff failed to wait 20 minutes before administering the test.

33.     The video, however, contained no time stamp, ran for well over 20 minutes from the time Plaintiff and suspect entered the building to the time that suspect entered the room for the breath test, and showed obvious skips or jumps for unknown lengths of time.  Additionally, forensic analysis of the evidence video file as compared to the video test files revealed that it was not the original or copy of the original file from the subject Adams County substation, had a different video file format from that used by computers at the subject Adams County substation, contained a 6-day discrepancy between the date the video file was encoded and the date it was allegedly obtained, and was created using a different computer and/or software from that used a the subject Adams County substation.  The Sheriff's Office failed to save and secure a copy of the original format video, which was available for 86 days after the alleged incident occurred and before it was automatically overwritten and thus lost forever.

34.     Plaintiff is not aware of any prior criminal investigation and prosecution of Sheriff's Office employees for the same or similar type of alleged misconduct.

35.     Plaintiff is aware of at least two other officers who were accused of much more serious misconduct—falsifying time cards for their own pecuniary benefit by defrauding taxpayers.  The Sheriff's Office only investigated the two officers internally and did not turn the matter over for criminal investigation and prosecution by the District Attorney.  To the best of

Plaintiff's knowledge, neither of the two officers internally investigated for falsifying their time cards originated from a foreign country, and neither officer had previously filed charges of discrimination with the EEOC.

36. By contrast, Plaintiff's alleged misconduct—administering a breath test after failing to wait a full 20 minutes as recommended by Department of Health regulations—resulted in almost immediate reporting for criminal investigation and prosecution by the District Attorney.

37. Plaintiff was also aware of other instances where officers failed to wait the full 20 minutes, and to Plaintiff' knowledge, none of those other instances resulted in any internal discipline, termination, or criminal prosecution.

38. During the course of the Sheriff's Office Internal Affairs investigation of the charges, Plaintiff not only denied any wrongdoing, he also presented exonerating evidence.

39. Despite the exonerating evidence, on or about October 23, 2012, Defendant Engelsman recommended termination of Plaintiff's employment.

40. Plaintiff appealed Defendant Engelsman's recommendation to the Sheriff's Office Appeal Board, and on November 21, 2012, the Board supported Defendant Engelsman's recommendation.

41. On December 20, 2012, Plaintiff then appealed directly to the Sheriff, Defendant Darr, who tabled his findings pending additional consideration.

42. Meanwhile, and as a result of this action by the Sheriff's Office, Plaintiff submitted his third Charge of Discrimination (Charge No. 541-2013-00305) against the Sheriff's Office with the EEOC on or about December 6, 2012.

43. Plaintiff received notification from the EEOC of his right to sue for this third charge on April 9, 2014.

### *Facts Relating to Plaintiff's Fourth Charge of Discrimination*

44. On or about July 2, 2013—seven months after Plaintiff submitted his third Charge of Discrimination and after his appeal to the Sheriff—the Sheriff's Office terminated Plaintiff's employment.

45. The Sheriff's Office also made the decision to terminate Plaintiff's employment before he was tried on the criminal charges.

46. On October 23, 2013, the Adams County District Court dismissed one of the forgery charges against Plaintiff at the prosecutor's request.

47. On November 4, 2013, the criminal case against Plaintiff went to trial but ultimately resulted in a mistrial due to testimony by a witness of the prosecution concerning previously undisclosed and/or inadmissible evidence from the internal investigation of the Sheriff's Office.

48. Thereafter, on or about January 10, 2014, all remaining criminal charges against Plaintiff were dropped.

49. As a result of the retaliatory action of the Sheriff's Office, Plaintiff submitted his fourth Charge of Discrimination (Charge No. 541-2014-00966) against the Sheriff's Office with the EEOC on or about March 25, 2014.

50. Plaintiff received notification from the EEOC of his right to sue for this fourth charge on June 19, 2014.

### *Factual Allegations of Plaintiff's Damages*

51. The actions of the Defendants during the course of Plaintiff's employment took a financial, physical, and emotional toll on Plaintiff.

52. As previously alleged, the Defendants' action of placing Plaintiff on PIP, prevented him from earning extra income as a Field Training Officer in an amount to be proven at trial.

53. As previously alleged, the Defendants' actions in causing Plaintiff to be criminally investigated, charged, and placed on administrative leave prevented him from earning extra off-duty income as a teacher at local institutions of higher learning and other approved law enforcement related activities in an amount to be proven at trial.

54. The Defendants' actions in terminating Plaintiff's employment with the Sheriff's Office ended all of Plaintiff's income and corresponding benefits in an amount to be proven at trial. Furthermore, because the Sheriff's Office terminated Plaintiff's employment while felony charges were still pending against him, Plaintiff lost several job offers that were contingent upon him passing a criminal background check.

55. The Defendants' discriminatory, hostile, and retaliatory actions during the course of Plaintiff's employment caused him to suffer mental and physical pain and suffering, humiliation, loss of reputation, emotional distress, and loss of enjoyment of life, all requiring Plaintiff to seek and receive medical treatment and counseling, including the corresponding costs and expenses thereof.

56. The Defendants' discriminatory, hostile, and retaliatory actions during the course of Plaintiff's employment have also caused and will cause Plaintiff to incur attorneys' fees, expert witness fees, and related legal costs and expenses.

### FIRST CLAIM FOR RELIEF

(**Violation of the Civil Rights Act 1964, 42 U.S.C. §2000e** *et seq*. **– Hostile Work Environment & Discrimination in Terms, Conditions, or Privileges of Employment**)

57. Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1 through 56 of this Complaint.

58. The Defendants violated 42 U.S.C. §2000e-2(a)(1) by intentionally creating and/or tolerating a hostile work environment toward Plaintiff and by refusing to hire and consider Plaintiff for a more desirable detective position within the Sheriff's Office in November 2011.

59. As previously alleged, Plaintiff was born in Romania, is of East European decent, and was routinely subjected to disparaging, hurtful, and humiliating name-calling and epithets ("communist" and "eastern block fucker") that directly referred to his ancestry and place of birth.

60. In addition to the name-calling, other previously alleged circumstances contributed to the hostile environment toward Plaintiff, including the fact that the Sheriff's Office declined to promote or transfer Plaintiff to an available detective position in 2009 despite his qualifications and high-ranking eligibility, that Plaintiff was singled out for admonition and ridicule in in connection with the performance of his duties (arresting suspect for cruelty to animals) and taking steps to protect himself (without incident) from a potentially vicious dog, and that he was denied receiving a Life Saving Medal for saving an elderly man's life despite being nominated for the award.

61. In addition, the Defendants unlawfully discriminated against Plaintiff in the terms, conditions, or privileges of employment because of his national origin by intentionally refusing to consider him or otherwise extend his eligibility for one of four vacant detective positions in November 2011 despite Plaintiff's inclusion as the fourth highest in rank on the eligibility list, Plaintiff's inquiry into and request for consideration for the position before the list expired, Plaintiff's high qualifications for the position, and the existence of available policies and solutions for considering, transferring, or promoting Plaintiff, or at least extending Plaintiff's eligibility for such consideration, transfer, or promotion.

62. Plaintiff's colleagues on the list who were promoted or transferred to the vacant positions are not of Romanian or East European decent and are not believed to have been born in and emigrated from any other foreign country.

63. As a direct and proximate result of the Defendants' unlawful and intentional discriminatory actions, Plaintiff sustained injuries, damages, and losses in an amount to be proven at trial and including, without limitation, loss of income, damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, attorneys' fees and related costs and expenses.

## SECOND CLAIM FOR RELIEF

(**Violation of the Civil Rights Act 1964, 42 U.S.C. §2000e** *et seq*. **– Retaliation**)

64. Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1 through 63 of this Complaint.

65. The Defendants violated 42 U.S.C. §2000e-3(a) by intentionally retaliating against Plaintiff for asserting his legal right to file charges of discrimination with the EEOC and/or reporting discriminatory conduct within the Sheriff's Office.

66. As previously alleged, despite Plaintiff's exceptional prior performance reviews, the Defendants affirmatively placed Plaintiff on a disciplinary program known as PIP one month after Plaintiff filed his first Charge of Discrimination. The basis for doing so specifically referred to instances of discriminatory conduct set forth in Plaintiff's first charge.

67. Furthermore and as previously alleged, after completing PIP successfully and after filing a second Charge of Discrimination, the Defendants singled out Plaintiff for internal and criminal investigation, ultimately resulting in prosecution, for allegedly failing to observe a DUI suspect for a full 20 minutes prior to administering an alcohol breath test.

68. Other officers of the Sheriff's Department who had failed to properly wait the full 20 minutes despite reporting otherwise were not subjected to investigation, prosecution, and termination. In addition, other officers who were accused of much more serious misconduct, such as falsely reporting their hours, were not subjected to external investigation and criminal prosecution. Nevertheless, the Defendants focused solely on Plaintiff in an attempt to humiliate and embarrass him, and ultimately to provide some proper basis for terminating Plaintiff's employment.

69. Forensic analysis of the electronic video file on which the Defendants and District Attorney relied as primary evidence against Plaintiff revealed that the video was unreliable for accurately determining elapsed time (at best) and manipulated for use against Plaintiff (at worst).

70. The Defendants terminated Plaintiff's employment on approximately July 2, 2012, before awaiting the outcome of the pending prosecution that the Defendants instigated.

71. The criminal prosecution ultimately resulted in the complete dismissal and/or dropping of all charges without any verdict, finding, or admission of Plaintiff's guilt or wrongdoing.

72. As a direct and proximate result of the Defendants' unlawful retaliatory actions, Plaintiff sustained injuries, damages, and losses in an amount to be proven at trial and including, without limitation, loss of employment and loss of past and future income and employment benefits, damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, attorneys' fees and related costs and expenses.

WHEREFORE, Plaintiff, Catalin G. Pavel, respectfully requests that this Court enter judgment in favor of the Plaintiff and against the Defendant Adams County Sheriff's Office and Defendants Sheriff Darr and Undersheriff Engelsman, in their official capacities as agents of the Sheriff's Office, jointly and severally, as follows:

(a) Front pay (in lieu of reinstatement) in an amount to be proven at trial that will make Plaintiff whole from the time of judgment to an appropriate time thereafter, pursuant to 42 U.S.C. §2000e-5(g);

(b) Back pay in an amount to be proven at trial, pursuant to 42 U.S.C. §2000e-5(g)(1);

(c) Compensatory damages in an amount to be proven at trial for Plaintiff's damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional

distress, loss of enjoyment of life, medical and healthcare treatment and expenses, pursuant to 42 U.S.C. §1981a;

    (d)    Pre- and post-judgment interest;

    (e)    Reasonable attorneys' fees, costs, and expenses, including expert witness fees, pursuant to 42 U.S.C. §2000e-5(k) and §1988; and

    (f)    Any additional relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 7th day of July, 2014.

                              BEEM & ISLEY, P.C.

                              s/Clifford L. Beem
                              Clifford L. Beem
                              A. Mark Isley
                              730 - 17th Street, Suite 850
                              Denver, Colorado  80202
                              Ph:   303.894.8100
                              Fax:  303.894.8200
                              clbeem@beemlaw.net
                              amisley@beemlaw.net
                              *Counsel for Plaintiff*

Plaintiff's Address:
4356 Mt. Sneffels Street
Brighton, Colorado 80601