## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01886-WYD-CBS

CATALIN G. PAVEL,

      Plaintiff,

v.

ADAMS COUNTY SHERIFF'S OFFICE;
SHERIFF DOUGLAS N. DARR, in his official and individual capacities;
UNDERSHERIFF ROGER ENGELSMAN, in his official and individual capacities;
COMMANDER MARK MITCHELL, in his individual capacity;
COMMANDER JIM HINRICHS, in his individual capacity;
SERGEANT KEVIN CURRIER, in his individual capacity; and
SERGEANT GENE CLAPS, in his individual capacity;

      Defendants.

---

### AMENDED COMPLAINT

---

Plaintiff, Catalin G. Pavel, by and through his counsel, BEEM & ISLEY, P.C., respectfully submits this Amended Complaint against the above-named Defendants, and alleges and avers as follows:

### JURISDICTION AND VENUE

1.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, §1981a, §1983, §1985, §1988, and the Fourth Amendment to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.

2.     Venue is proper in the United States District Court in Colorado pursuant to 28 U.S.C. § 1391(b) because the Defendants are a Colorado public entity, officers of that public entity, and/or residents of Colorado. In addition, the events and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.     Plaintiff, Catalin G. Pavel, is and was at all times relevant to this Complaint a citizen of the State of Colorado, residing in Brighton, Colorado. Plaintiff is a male immigrant from Romania who was previously employed by the Adams County Sheriff's Office as a Deputy Sheriff.

4.     Defendant, Adams County Sheriff's Office ("Sheriff's Office"), is a county office created by the Colorado Constitution, *see* Colo. Const. Art. XIV, §8, with its principal office located at 332 North 19th Avenue, Brighton, Colorado 80601.

5.     Defendant, Sheriff Douglas N. Darr ("Defendant Darr"), is and was at all times relevant the individual elected to the county office of the Sheriff of Adams County, a resident of the State of Colorado, and an agent for the Sheriff's Office.

6.     Defendant, Undersheriff Roger Engelsman ("Defendant Engelsman"), is and was at all times relevant the individual appointed by Sheriff Darr to the county office of the Undersheriff, a resident of the State of Colorado, and an agent for the Sheriff's Office.

7.     Defendant, Commander Mark Mitchell ("Defendant Mitchell"), is and was at all times relevant a commander (or lieutenant) for the Sheriff's Office and a resident of the State of Colorado.

8.    Defendant, Commander Jim Hinrichs ("Defendant Hinrichs"), is and was at all times relevant a detective sergeant, currently a commander for the Sheriff's Office, and a resident of the State of Colorado.

9.    Defendant, Sergeant Kevin Currier ("Defendant Currier"), is and was at all times relevant a detective sergeant for the Sheriff's Office and a resident of the State of Colorado.

10.    Defendant, Sergeant Gene Claps ("Defendant Claps"), is and was at all times relevant a sergeant in the Sheriff's Office Patrol Division and a resident of the State of Colorado.

## GENERAL FACTUAL ALLEGATIONS

11.    Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 10 of this Complaint.

12.    The claims and allegations set forth herein all arise out of a series of hostile, discriminatory, adverse, and retaliatory actions against Plaintiff in connection with his employment as an Adams County Deputy Sheriff. These actions culminated in the malicious prosecution of Plaintiff in violation of his Fourth Amendment constitutional rights.

13.    Plaintiff was born in Romania in 1975, while it was still part of the Soviet/communist block of East European nations. He immigrated to the United States in February 1996 and became a U.S. citizen in 2002. Plaintiff earned a Bachelor of Science ("B.S.") degree in Applied Psychology with emphasis in Criminal Psychology from Regis University in 2006, and a Master's degree in Organizational Leadership, specializing in Strategic Management, from Colorado State University in 2011. Plaintiff speaks three languages fluently: Romanian, English, and Spanish. Plaintiff speaks English beautifully with a foreign accent.

14. The Sheriff's Office hired Plaintiff in December 2002 as a civilian Community Service Officer. In December 2003, Plaintiff became a Deputy Sheriff—first assigned to the Jail Division and then the Patrol Division as of April 2005. Plaintiff eventually became a Senior Deputy Sheriff—a position he maintained until his termination. Plaintiff early and often expressed his goal to become a detective for the Sheriff's Office.

15. The supervisory hierarchy in the Sheriff's Office from the highest ranking down is as follows: Sheriff, Undersheriff, Captain (or Division Chief), Lieutenant (or Commander), and Sergeant. Deputies, such as Plaintiff, and a specialty rank of deputies known as detectives, are not considered supervisory positions.

### Facts Relating to Plaintiff's First Charge of Discrimination

16. During the course of his employment with the Sheriff's Office, certain co-workers and fellow law enforcement officers of Plaintiff addressed and referred to him as "communist," "eastern block," or worse, "eastern block fucker," in reference to his foreign accent and Romanian birthplace. Even Captain T. J. Coates, a higher ranking and supervisory officer within Plaintiff's chain of command, used the terms "eastern block" and "eastern block fucker" to address or refer to Plaintiff. This conduct continued at least through December 2011.

17. At first, the name-calling and disparaging references seemed harmless; but over time, the tone and context became more negative, aggressive, and hostile.

18. In late 2008, Plaintiff applied for a position as Crime Lab Detective—a position for which he met both minimum and preferred qualifications as a result of his experience, testing, and education. In approximately March 2009, Plaintiff went through the published procedures to test and qualify for the position. Out of all candidates for the position, Plaintiff

ranked number 1 following the testing process and background checks. At the end of the process, Plaintiff was also required to go through an additional unannounced interview with the Captain of the Detective Division, Captain Fred Stoll. Following this extra, previously unannounced interview, Plaintiff's ranking was lowered to number 2; and the detective position was given to another officer, Mark Bailey.

19.     Later, in approximately September 2011, Plaintiff learned from another Sheriff's Office deputy with direct knowledge that Officer Bailey not only ranked lower than Plaintiff on his test scores, but also had less patrol experience than Plaintiff, had no Bachelor's degree, did not speak Spanish (a useful second language for a detective in Adams County, Colorado), and had a worse on-the-job driving record than Plaintiff (an important consideration when issuing a take-home vehicle to a detective). Officer Bailey was not born in a foreign country.

20.     Nevertheless, Plaintiff was on a new eligibility list to fill four (4) vacancies in the Detective Division. Plaintiff was fourth on a list of five eligible candidates—ranked in order of eligibility. The list was scheduled to expire on December 2, 2011. On November 29, 2011, the Sheriff's Office made an internal announcement for a new testing process for the detective positions. On November 30, 2011, Plaintiff contacted Captain Michael McIntosh, Administrative Captain, concerning his interest in being considered for the available detective positions as Plaintiff was still on the active eligibility list.

21.     Despite the four vacancies, Captain McIntosh informed Plaintiff that only the first three on the list were being transferred to the Detective Division, that Plaintiff would not be considered, and that he must go through the transfer process again. Captain McIntosh gave no explanation for the decision. Even assuming there was an issue or problem with the fast-

approaching expiration deadline, alternative solutions existed under the Sheriff's Office policy and past practices, including extending the timeframe for the eligibility list (policy section 711.40 "ELIGIBILITY LIST"), or promoting Plaintiff on paper with actual transfer to occur at a later more suitable time.

22.     Plaintiff later learned that the fifth-ranked officer below him on the list was promoted to criminal lab detective.

23.     None of the four officers transferred from the list to detective positions were born in foreign countries.

24.     Also in 2011, Plaintiff was nominated to receive a Life Saving Medal as a result of Plaintiff's live-saving CPR performed on an elderly man during an emergency medical call in 2010.  The man expressed his extreme gratitude to Plaintiff and the Sheriff's Office by sending thank-you notes.  When Plaintiff learned of the nomination, he contacted two of his superiors, including Captain McIntosh, on or about April 15, 2011, to inquire about the award so that Plaintiff could invite the man whose life he saved to the award ceremony.  Captain McIntosh responded to Plaintiff's inquiry about one week later on April 24, 2011, informing him that it was too late for him to receive a medal but that he could get one in 2012.  Plaintiff learned later that medals are not awarded retroactively.  However, Plaintiff did receive the medal retroactively but only after Plaintiff filed his first Charge of Discrimination.  Additionally, other nominated officers have received the medal for much lesser actions.

25.     In September 2011, Plaintiff arrested a man with a trapped squirrel who admitted he was in the process of taking the squirrel to a nearby waterway to drown it.  An independent witness also corroborated that the man was known for trapping and drowning squirrels.  Plaintiff

made the arrest based on a charge of cruelty to animals, which is a class 6 felony. Following the arrest, Plaintiff was forced to release the man. Captain Coates took the position that Plaintiff lacked probable cause for the arrest, while Defendant Mitchell seemed less concerned about probable cause and more concerned about potential liability to the Sheriff's Office for any harm the man might have suffered in the jail. The situation was used as a basis to berate, belittle, and humiliate Plaintiff within the Sheriff's Office for making an arrest that he believed he was obligated to do as a Deputy Sheriff under Colorado law.

26. After responding to a call for service in October 2011 to cover for Defendant Mitchell, Plaintiff pulled his handgun to protect himself, if necessary, from an unleashed growling pit bulldog that started to approach them. At that moment in time, Plaintiff's handgun was the only effective weapon he had available. Luckily, when Plaintiff pulled and pointed the gun, the dog retreated back to a yard across the street. Following the incident, Defendant Mitchell admonished Plaintiff for pulling his handgun on the dog and reported the incident to Plaintiff's supervisor. Not only did the Plaintiff avoid shooting the dog, but others in the Sheriff's Office who had actually shot and killed potentially vicious dogs were not admonished for those incidents. In fact, the Sheriff's Office policy in effect at the time (section 417.45 "FIREARMS") allowed officers to kill seriously injured or dangerous animals.

27. As a result of these incidents, which taken in combination with each other, including the increasingly inappropriate and hostile names used to address and refer to him, Plaintiff became concerned that he was being treated differently and detrimentally from others in the Sheriff's Office who were born in the United States and spoke without any sort of foreign-sounding accent. Accordingly, on or about December 5, 2011, Plaintiff submitted his first

Charge of Discrimination (Charge No. 541-2012-00867) against the Sheriff's Office with the Equal Employment Opportunity Commission ("EEOC").

28.     Defendants Darr, Engelsman, and Mitchell were among the individuals named in Plaintiff's first Charge of Discrimination.

29.     Plaintiff received notification from the EEOC of his right to sue for this charge on April 9, 2014.

### *Facts Relating to Plaintiff's Second Charge of Discrimination*

30.     On January 4, 2012—just one month after Plaintiff filed his first Charge of Discrimination—the Sheriff's Office placed him on a Performance Improvement Plan ("PIP") for "noticeable decreases in an employee's performance." The specific issues for improvement identified in the PIP form were based directly on two of Plaintiff's examples of discriminatory treatment set forth in his first Charge of Discrimination that occurred three to four months earlier: (1) admonishing Plaintiff for pulling a handgun on a potentially vicious dog in October 2011, and (2) berating, belittling, and humiliating Plaintiff for arresting a man who had been trapping and drowning squirrels for cruelty to animals in September 2011.

31.     At all times prior to being placed on PIP, Plaintiff earned above average performance evaluations. In fact, at the time of Plaintiff's most recent prior employment evaluation from February 13, 2011, Plaintiff met or exceeded expectations on all categories and earned an overall score of 3.8 out of a possible total of 5.

32.     In placing Plaintiff on PIP, the Sheriff's Office also suspended him as a Field Training Officer, thereby depriving Plaintiff of the ability to earn extra income in that capacity.

33.     As a result of this action by the Sheriff's Office, Plaintiff submitted his second Charge of Discrimination (Charge No. 541-2012-01081) against the Sheriff's Office with the EEOC on or about January 17, 2012.

34.     Plaintiff received notification from the EEOC of his right to sue for this second charge on April 9, 2014.

### *Facts Relating to Plaintiff's Third Charge of Discrimination*

35.     Plaintiff completed the 90-day PIP procedure without any findings of significant performance deficiencies in approximately April 2012.

36.     On or about May 24, 2012, the Sheriff's Office initiated a criminal investigation of Plaintiff arising out of a May 17, 2012 driving-under-the-influence ("DUI") arrest made by Plaintiff. The investigation centered on whether Plaintiff truthfully reported observing the suspect for the required 20 minutes before administering a breath test (using an Intoxilyzer apparatus) to determine the suspect's breath alcohol level.

37.     On or about July 9, 2012, Plaintiff was arrested, detained, and criminally charged with two felony counts of forgery and second degree official misconduct for allegedly falsifying arrest records. The Sheriff's Office also placed Plaintiff on administrative leave, which in combination with the criminal charges prevented Plaintiff from engaging in permissible off-duty employment, such as teaching college-level classes and other approved law enforcement related activities because of criminal background checks.

38.     The investigation and subsequent arrest and criminal charges were inseparably based on a surveillance video recording of the Plaintiff and the suspect at the Adams County

substation that, as alleged in greater detail below, was not saved in the original LNR video format and failed to show, much less prove, any wrongdoing by Plaintiff.

39.     Plaintiff is not aware of any prior criminal investigation and prosecution of Sheriff's Office employees for the same or similar type of alleged misconduct.

40.     Plaintiff is aware of at least two other officers who were accused of much more serious misconduct for improperly reporting their working hours. The Sheriff's Office only investigated the two officers internally and did not turn the matter over for criminal investigation and prosecution by the District Attorney. To the best of Plaintiff's knowledge, neither of the two officers internally investigated originated from a foreign country, and neither officer had previously filed charges of discrimination with the EEOC.

41.     By contrast, Plaintiff's alleged misconduct—administering a breath test after failing to wait a full 20 minutes as recommended by Colorado Department of Public Health and Environment ("CDPHE") regulations—resulted in almost immediate reporting for criminal investigation and prosecution by the District Attorney.

42.     Plaintiff is also aware of other instances where officers failed to wait the full 20 minutes, and to Plaintiff's knowledge, none of those other instances resulted in any internal discipline, termination, or criminal prosecution.

43.     During the course of the Sheriff's Office Internal Affairs investigation of the charges, Plaintiff not only denied any wrongdoing, he also presented exonerating evidence to Defendant Engelsman, the Sheriff's Office Appeal Board (comprised of three individuals appointed by Defendant Engelsman), and Defendant Darr. Despite the exonerating evidence, Defendant Engelsman recommended termination of Plaintiff's employment on or about October

23, 2012. The Sheriff's Office Appeal Board supported Defendant Engelsman's recommendation on or about November 21, 2012. Defendant Darr, following Plaintiff's direct appeal to him, tabled his findings pending additional consideration on or about December 20, 2012.

44. Meanwhile, and as a result of this action by the Sheriff's Office, Plaintiff submitted his third Charge of Discrimination (Charge No. 541-2013-00305) against the Sheriff's Office with the EEOC on or about December 6, 2012.

45. Plaintiff received notification from the EEOC of his right to sue for this third charge on April 9, 2014.

### *Facts Relating to Plaintiff's Fourth Charge of Discrimination*

46. On or about July 2, 2013—seven months after Plaintiff submitted his third Charge of Discrimination and after his appeal to the Sheriff—the Sheriff's Office terminated Plaintiff's employment before his trial on the pending criminal charges.

47. On October 23, 2013, the Adams County District Court dismissed one of the forgery charges against Plaintiff at the District Attorney's request.

48. On November 4, 2013, the criminal case against Plaintiff went to trial but ultimately resulted in a mistrial. Thereafter, on or about January 10, 2014, the District Attorney moved to dismiss the case against Plaintiff in the interest of justice because the District Attorney determined that no reasonable likelihood of successful prosecution existed.

49. As a result of the retaliatory action of the Sheriff's Office, Plaintiff submitted his fourth Charge of Discrimination (Charge No. 541-2014-00966) against the Sheriff's Office with the EEOC on or about March 25, 2014.

50. Plaintiff received notification from the EEOC of his right to sue for this fourth charge on June 19, 2014.

### *Factual Allegations of Plaintiff's Damages*

51. The actions of the Defendants in their official and individual capacities during the course of Plaintiff's employment took a financial, physical, and emotional toll on Plaintiff.

52. The action of the Sheriff's Office in placing Plaintiff on PIP, prevented him from earning extra income as a Field Training Officer in an amount to be proven at trial.

53. The Defendants' actions in causing Plaintiff to be criminally investigated, charged, and placed on administrative leave prevented him from earning extra off-duty income as a teacher at local institutions of higher learning and other approved law enforcement related activities in an amount to be proven at trial.

54. The Defendants' actions in terminating Plaintiff's employment with the Sheriff's Office ended all of Plaintiff's income and corresponding benefits in an amount to be proven at trial. Furthermore, because the Sheriff's Office terminated Plaintiff's employment while felony charges were still pending against him, Plaintiff lost several job offers that were contingent upon him passing a criminal background check.

55. The Defendants' discriminatory, hostile, and retaliatory actions during the course of Plaintiff's employment caused him to suffer mental and physical pain and suffering, humiliation, loss of reputation, emotional distress, and loss of enjoyment of life, all requiring Plaintiff to seek and receive medical treatment and counseling, including the corresponding costs and expenses thereof.

56.     The Defendants' discriminatory, hostile, and retaliatory actions during the course of Plaintiff's employment have also caused and will cause Plaintiff to incur attorneys' fees, expert witness fees, and related legal costs and expenses.

**FIRST CLAIM FOR RELIEF**
**(Violation of the Civil Rights Act 1964, 42 U.S.C. §2000e *et seq*. – Hostile Work Environment & Discrimination in Terms, Conditions, or Privileges of Employment)**

57.     Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1 through 56 of this Complaint.

58.     The allegations in this First Claim for Relief are against Defendant Sheriff's Office and Defendants Darr and Engelsman in their official capacities.

59.     The Defendants violated 42 U.S.C. §2000e-2(a)(1) by intentionally creating and/or tolerating a hostile work environment toward Plaintiff and by refusing to promote and consider Plaintiff for a more desirable detective position within the Sheriff's Office.

60.     As previously alleged, Plaintiff was born in Romania, is of East European decent, and was routinely subjected to disparaging, hurtful, and humiliating name-calling and epithets ("communist" and "eastern block fucker") that directly referred to his ancestry and place of birth.

61.     In addition to the name-calling, other previously alleged circumstances contributed to the hostile environment toward Plaintiff, including the fact that the Sheriff's Office declined to promote or transfer Plaintiff to an available detective position in 2009 despite his qualifications and high-ranking eligibility, that Plaintiff was singled out for admonition and ridicule in connection with the performance of his duties (arresting suspect for cruelty to animals) and taking steps to protect himself (without incident) from a potentially vicious dog,

and that he was initially passed over for receiving a Life Saving Medal despite being nominated for the award.

62. The Defendants unlawfully discriminated against Plaintiff in the terms, conditions, or privileges of employment because of his national origin by intentionally refusing to consider him or otherwise extend his eligibility for one of four vacant detective positions in November 2011 despite Plaintiff's inclusion as the fourth highest in rank on the eligibility list, Plaintiff's inquiry into and request for consideration for the position before the list expired, Plaintiff's high qualifications for the position, and the existence of available policies and solutions for considering, transferring, or promoting Plaintiff, or at least extending Plaintiff's eligibility for such consideration, transfer, or promotion.

63. Plaintiff's colleagues, ranked above and below him on the list and who were promoted or transferred to the vacant positions, are not of Romanian or East European decent and are not believed to have been born in and emigrated from any other foreign country.

64. As a direct and proximate result of the Defendants' unlawful and intentional discriminatory actions, Plaintiff sustained injuries, damages, and losses in an amount to be proven at trial and including, without limitation, loss of income, damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, attorneys' fees and related costs and expenses.

## SECOND CLAIM FOR RELIEF
### (Violation of the Civil Rights Act 1964, 42 U.S.C. §2000e *et seq.* – Retaliation)

65. Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1 through 64 of this Complaint.

66.     The allegations in this Second Claim for Relief are against Defendant Sheriff's Office and Defendants Darr and Engelsman in their official capacities.

67.     The Defendants violated 42 U.S.C. §2000e-3(a) by intentionally retaliating against Plaintiff for asserting his legal right to file charges of discrimination with the EEOC and/or reporting discriminatory conduct within the Sheriff's Office.

68.     As previously alleged, despite Plaintiff's exceptional prior performance reviews, the Defendants placed Plaintiff on a disciplinary program known as PIP one month after Plaintiff filed his first Charge of Discrimination. The basis for doing so specifically referred to instances of discriminatory conduct set forth in Plaintiff's first charge.

69.     Furthermore and as previously alleged, after completing PIP successfully and after filing a second Charge of Discrimination, the Defendants singled out Plaintiff for internal and criminal investigation, ultimately resulting in felony charges, arrest, and prosecution, for allegedly failing to observe a DUI suspect for a full 20 minutes prior to administering an alcohol breath test.

70.     Other officers of the Sheriff's Department who had failed to properly wait the full 20 minutes were not subjected to investigation, prosecution, and termination. In addition, other officers who were accused of much more serious misconduct, such as improperly reporting their working hours, were not subjected to criminal prosecution. Nevertheless, the Defendants focused solely on Plaintiff in an attempt to humiliate and embarrass him, and ultimately to provide some basis for terminating Plaintiff's employment.

71.     Forensic analysis of the electronic video file on which the Defendants and District Attorney relied as primary evidence against Plaintiff revealed that the video was unreliable for

accurately determining elapsed time (at best) and manipulated for use against Plaintiff (at worst). And Defendants failed to save and secure exonerating evidence in the form of the original LNR format video with time stamp and time-gap display.

72.    The Defendants terminated Plaintiff's employment on approximately July 2, 2013, before awaiting the outcome of the pending prosecution that the Defendants instigated.

73.    The criminal prosecution ultimately resulted in the complete dismissal of all charges in the interest of justice without any verdict, finding, or admission of Plaintiff's guilt or wrongdoing.

74.    As a direct and proximate result of the Defendants' unlawful retaliatory actions, Plaintiff sustained injuries, damages, and losses in an amount to be proven at trial and including, without limitation, loss of employment and loss of past and future income and employment benefits, damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, attorneys' fees and related costs and expenses.

**THIRD CLAIM FOR RELIEF**
**(Deprivation of and Conspiracy to Deprive Plaintiff's Fourth Amendment Constitutional Rights Under Color of State Law Pursuant to 42 U.S.C. §§1983 & 1985 – Malicious Prosecution)**

75.    Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1 through 74 of this Complaint.

76.    The allegations in this Third Claim for relief are against Defendants Darr, Engelsman, Mitchell, Hinrichs, Currier, and Claps in their individual capacities.

77.    The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures and requires probable cause to support the institution of legal process.

78.     The Defendants, in their individual capacities and under color of state law, deprived Plaintiff of his Constitutional rights under the Fourth Amendment by initiating and engaging in a criminal investigation, resulting in criminal charges, arrest, and full prosecution of Plaintiff based on fabricated evidence and without probable cause.

79.     The criminal charges and prosecution arose out of a DUI arrest Plaintiff made on May 17, 2012, and subsequent unfounded allegations by three deputy sheriffs—Justin Johnson, Joseph McMullen, and James Cook—that Plaintiff may have falsely reported observing the suspect for at least 20 minutes before administering an alcohol breath test.

80.     The incident/investigation report, arrest report, and breath test checklist consistently indicate on their face that Plaintiff administered the breath test after observing the suspect for 20 minutes.

81.     Plaintiff consistently maintained that he followed CDPHE regulations by reporting the time as it appeared on the Intoxilyzer clock for the beginning and end of his observation period.  Unlike the timing devices for entry cards, which are automatically synchronized with a world time clock, the Intoxilyzer clock was set manually, could be changed at any time by instructors, and thus prone to human error.

82.     None of the accusing deputy sheriffs actually timed Plaintiff's observation of his DUI arrestee from start to finish, and they had no personal knowledge of the actual amount of time that Plaintiff observed the arrestee.

83.     Nevertheless, Defendant Mitchell, who was among those named in Plaintiff's first two Charges of Discrimination, took it upon himself to initiate an investigation after learning of the internal accusations against Plaintiff.

84. Defendant Mitchell relied in part on a discrepancy between the time of Plaintiff's entry into the substation on May 17, 2012, as recorded by Plaintiff's entry card, and the time recorded by Plaintiff using the Intoxilyzer clock. Defendant Mitchell, however, investigated the synchronization of the relevant timing devices one week later on May 24, 2012, and did not determine or otherwise know whether the Intoxilyzer clock was synchronized with the entry card time system on May 17, 2012. Several officers had access to and could have changed or updated the Intoxilyzer clock at any time during the intervening 7-day period; and Defendant Mitchell did not know whether any such time alteration of synchronization had occurred in the interim.

85. Defendant Mitchell reported the allegations against Plaintiff to the District Attorney's office on May 24, 2012—purportedly while inquiring as to whether the District Attorney would be pursuing DUI charges against Plaintiff's arrestee because of questions about the validity of the breath test. Any such questions, however, were subsequently resolved. A CDPHE representative (and prosecution expert witness) determined before Plaintiff's criminal trial that the arrestee's breath test was a good and valid test. At trial, the prosecution's Intoxilyzer expert, Detective Leroy Olivas of the Sheriff's Office, also agreed that the breath test was valid. Even if the test were invalidated because of an issue with observation time, it would have only compromised the Department of Revenue's administrative case against the arrestee—not the criminal charges and prosecution of the suspect in the courts based on Colorado DUI statutes and applicable case law.

86. Defendant Mitchell also presented his findings to his division chief, Captain Coates, and the investigation then moved to Defendant Hinrichs and Defendant Currier of the Sheriff's Office Detective Division.

87.     Defendant Hinrichs, the lead investigator, knew that none of the accusing deputy sheriffs observed or timed the Plaintiff from the moment he entered the substation on May 17, 2012, until he administered the breath test on the suspect.

88.     Defendant Hinrichs did not compare and confirm the consistency of each of the accusers' stories with Plaintiff's story, and he did not show the accusers the video as part of his investigation of the accusations against Plaintiff.

89.     During the course of their investigation, neither Defendant Hinrichs nor Defendant Currier determined whether the substation card entry timing devices were synchronized with the Intoxilyzer at the time of the alleged misconduct on May 17, 2012.

90.     A primary piece of evidence against Plaintiff was a surveillance video taken from the surveillance system at the Adams County substation where Plaintiff brought the DUI suspect for testing in the early morning hours of May 17, 2012.  The video, however, contained no running time stamp, ran for at least 19 minutes 15 seconds from the moment Plaintiff's observation period began to the time the suspect entered the Intoxilyzer room, and contained at least 4 obvious skips or jumps for unknown lengths of time (ranging anywhere from as little as 1 second to as long as 6 minutes 48 seconds).  Even discounting the unknown length of the time gaps, Plaintiff's observation of the suspect would have continued for at least another 2 minutes beyond 19 minutes 15 seconds while the Intoxilyzer was calibrated for testing.  Additionally, forensic analysis of the evidence video file as compared to the video test files revealed that it was not the original or even a copy of the original file from the subject Adams County substation and had a different video file format (ASF instead of LNR format) from the default proprietary format used by the substation surveillance system.  The conversion of the video format from

LNR to ASF resulted in a loss of both the running time stamp and visual displays of the length of time lapsed during the skips or gaps in the video. The analysis further revealed a 6-day discrepancy between the date the video file was encoded (May 18, 2012) and the date it was allegedly obtained by the Sheriff's Office (May 24, 2012); that it was created using a different codec version, computer, and/or software from that of the substation's computer server; and that it had been recompressed twice, which, according to the forensic experts, would only be done to help conceal evidence of editing and fabrication of the original.

91.     None of the individual Defendants who used the surveillance video as part of the criminal investigation and ultimate prosecution of Plaintiff knew who made or obtained the copy of it. At trial, Defendant Hinrichs first could not remember if he made the copy himself or had some unknown person help him do it, but later stated that Defendant Mitchell downloaded the copy. Defendant Mitchell testified that he obtained the video copy from Defendant Currier, but Defendant Currier denied knowing who made the copy. Defendant Claps testified that he saved a copy of the video with the time stamp but did not know what happened to it. Defendant Claps, however, denied that he made the video copy that was used as evidence against Plaintiff.

92.     These Defendants failed to save or secure the original surveillance video or a copy thereof in the original file format (LNR) from May 17, 2012, despite the fact that it remained available for copying 86 days after the Sheriff's Office investigative personnel became aware of the alleged incident. The failure to copy the video for 86 days caused it to be automatically overwritten with new data and lost forever. The lost original video format contained exonerating evidence in the form of a running time stamp with a visual display of the relevant time gaps.

93. Additionally, none of the Defendants obtained a copy of or otherwise saved the surveillance video from the camera on the other side of the substation area that also would have provided exonerating evidence for Plaintiff.

94. Plaintiff presented exonerating evidence directly to Defendants Engelsman and Darr during internal employment termination interviews, including his consistent use of the Intoxilyzer clock to record his time, the passage of over 19 minutes of real-time captured in the video (even discounting the 4 obvious skips of unknown amounts of time), and the fact that at least 2 additional minutes of time would be required to calibrate the Intoxilyzer before administering the test. Nevertheless, Defendants Darr and Engelsman ignored the exonerating evidence as well as known flaws in the investigation, such as the 7-day time delay and discrepancy in Defendant Mitchell's investigation into the synchronization of relevant timing devices, and the lack of any evidence by the three accusers that anyone actually timed Plaintiff during the observation period of his arrestee. Defendants Darr and Engelsman thus approved and supported pressing felony charges against Plaintiff by the Sheriff's Office and, as previously alleged, used these false charges as a basis to support terminating Plaintiff's employment even before Plaintiff's trial.

95. The charges against Plaintiff resulted in his arrest and detention at the Sheriff's Office on July 9, 2012, the service of a felony summons (signed by Defendant Hinrichs) upon the Plaintiff requiring him to appear in Court to defend the baseless criminal charges against him, and the seizure of Plaintiff's uniquely personal identifying information, specifically including his fingerprints and DNA samples for reporting to the Colorado and Federal Bureaus of Investigation.

96.     The case proceeded to trial, which revealed the previously alleged inconsistencies, flawed investigation, and unreliable evidence, and which ultimately resulted in a mistrial because of Defendant Claps' testimony concerning inadmissible Internal Affairs information.

97.     Cross-examination of the three accusing deputy sheriffs revealed that they, themselves, failed to follow certain CDPHE regulations for timing their respective DUI arrestees on May 17, 2012.   Nevertheless, none of the three accusers were subjected to internal investigation, much less prosecution, by the Sheriff's Office or the individual Defendants named herein.   Additionally, none of the accusing deputy sheriffs were born in foreign countries, spoke English with a foreign accent, or filed EEOC complaints against the Sheriff's Office and/or its agents and employees.

98.     Thereafter, the District Attorney dropped all remaining charges against Plaintiff in the interest of justice, and the case was dismissed on or about January 10, 2014.

99.     The Defendants' actions in using flawed, fabricated, and unreliable evidence and failing to collect and save exonerating evidence in order to press criminal charges against Plaintiff were done willfully, intentionally, maliciously, and in callous disregard of Plaintiff's federally protected rights in an effort to discredit, humiliate, and retaliate against Plaintiff, and to provide some basis for ultimately terminating Plaintiff's employment with the Sheriff's Office.

100.     The Defendants investigated Plaintiff and turned the flawed, fabricated, and unreliable evidence over to the District Attorney to prosecute Plaintiff despite the fact that other Sheriff's Office deputies, who either failed to comply with the 20-minute observation requirement, or to follow other CDPHE regulations regarding how to time the observation period (which included the Plaintiff's three accusers) were not investigated—much less prosecuted.

101.    The Defendants named in this Third Claim for Relief acted in concert and thus conspired to make a case for and pursue the wrongful and malicious prosecution against Plaintiff because of his national origin and in order to facilitate his termination.

102.    The contours of Fourth Amendment violations for unreasonable arrests, searches, and seizures and the requirement of probable cause based on reasonably trustworthy information were and have been clearly established by the decisional law of both the United States Supreme Court, *see, e.g., Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964) (warrantless arrest and subsequent search and seizure must be supported by probable cause under Fourth Amendment); *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676 (1978) (falsified evidence does not support probable cause); and the Tenth Circuit Court of Appeals, *see, e.g., Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) (clearly established law requires officers to look at totality of circumstances in determining probable cause); *Pierce v. Gilchrist*, 359 F.3d 1279, 1297-99 (10th Cir. 2004) (clearly established that the deliberate or reckless falsification or omission of evidence was a constitutional violation under Fourth Amendment).

103.    Reasonable officers in the Defendants' positions knew or should have known that their actions violated Plaintiff's Fourth Amendment constitutional rights under clearly established law.

104.    As a direct and proximate result of the Defendants' unlawful actions in violation of Plaintiff's Fourth Amendment rights, Plaintiff sustained injuries, damages, and losses in an amount to be proven at trial and including, without limitation, being fully prosecuted and forced to stand trial for baseless criminal charges, loss of employment and loss of past and future income and employment benefits, damaged reputation, humiliation, mental anguish, physical and

mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, attorneys' fees and related costs and expenses.

WHEREFORE, Plaintiff, Catalin G. Pavel, respectfully requests that this Court enter judgment in his favor of the Plaintiff and against the Defendants as follows:

(1)    With respect to Plaintiff's First and Second Claims for relief against Defendant Sheriff's Office and Defendants Darr and Engelsman, in their official capacities as agents of the Sheriff's Office, jointly and severally:

(a)    Front pay (in lieu of reinstatement) in an amount to be proven at trial that will make Plaintiff whole from the time of judgment to an appropriate time thereafter, pursuant to 42 U.S.C. §2000e-5(g);

(b)    Back pay in an amount to be proven at trial, pursuant to 42 U.S.C. §2000e-5(g)(1);

(c)    Compensatory damages in an amount to be proven at trial for Plaintiff's damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, pursuant to 42 U.S.C. §1981a;

(d)    Pre- and post-judgment interest;

(e)    Reasonable attorneys' fees, costs, and expenses, including expert witness fees, pursuant to 42 U.S.C. §2000e-5(k) and §1988; and

(f)    Any additional relief the Court deems proper and just.

(2)    With respect to Plaintiff's Third Claim for relief against Defendants Darr, Engelsman, Mitchell, Hinrichs, Currier, and Claps in their individual capacities, jointly and severally:

(a)    Compensatory damages in an amount to be proven at trial for Plaintiff's damaged reputation, humiliation, mental anguish, physical and mental pain and suffering, emotional distress, loss of enjoyment of life, medical and healthcare treatment and expenses, pursuant to 42 U.S.C. §1983;

(b)    Punitive damages as punishment and deterrence against the commission of future such conduct, pursuant to 42 U.S.C. §1983;

(c)    Pre- and post-judgment interest;

(d)    Reasonable attorneys' fees, costs, and expenses, including expert witness fees, pursuant to 42 U.S.C. §1988 and any other applicable law; and

(e)    Any additional relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 1st day of August, 2014.

BEEM & ISLEY, P.C.

s/Clifford L. Beem
Clifford L. Beem
A. Mark Isley
730 - 17th Street, Suite 850
Denver, Colorado  80202
Ph:   303.894.8100
Fax:  303.894.8200
clbeem@beemlaw.net
amisley@beemlaw.net
*Counsel for Plaintiff*